No. 51.—James Stroud, plaintiff in error, *vs.* Henry S. Mays and Beersheba Stroud, defendants in error.

[1.] Where there is a variety of testimony on both sides, and the case is fairly submitted to the Jury, and no injustice has been done, the Court will not interfere with the verdict, upon matters of fact, and especially where fraud in fact, is in issue, by granting a new trial.

[2.] To justify the Court in setting aside the verdict of the Jury, where there is contradictory testimony, and there has been no misdirection in any matter of law; and where, as to matter of fact, the case has been fairly open before them, and peculiarly within their province, it should be able to say judicially, that the conclusion to which they have come is clearly erroneous, and must have arisen from some unquestionable mistake, or some improper motive or bias.

Case for Deceit, in Butts Superior Court.    Tried before Judge Floyd, September Term, 1848 ; and motion for new trial.

In January, 1846, Beersheba Stroud, who owned a life estate in a negro slave, Simon, and Henry S. Mays, who owned the remainder, jointly sold the slave to James Stroud, a relative from Chambers County, Ala. for $550, and gave a bill of sale without warranty.    About 27th May, 1846, the slave died, and James Stroud brought an action upon the case, for deceit, against Beersheba Stroud and Henry S. Mays, in the sale of the negro, by false representations as to his soundness, and fraudulent concealment of defects, known to the sellers.

Upon the trial, at September Term, 1848, much testimony was submitted to the Jury, of which the following is a brief :

*Jesse Clark* proved the sickness of the negro, and his death, and that he was well treated and but moderately worked by plaintiff.

Dr. *James H. Low* attended on the negro, from 6th May to .27th, when he died.   The disease was bilious pneumonia, terminating with a congestion of the brain and dropsy of the chest. From an examination of the slave, and marks on his body, thinks that he had been previously treated for the same disease.

*Dudley Watt* knew the slave from the time plaintiff bought him till his death.   He was all the while unwell—complained of a pain in his ankles, which passed into his legs and body, and then completely disabled him.   He seemed bloated, and was afflicted with shortness of breath, which continued until his death.   Plaintiff's attention, Dr's. bill, &c. worth $100.

*Henry Smith* had the negro Simon to roll logs with him a few days after his purchase.   He was deficient in strength in his ankles.   Defendant, Mays, told witness that he sold the negro low, because he did not wish him sold out of the family.

*James Singley* knew the negro in possession of defendant, in 1845, when he was so diseased as to be unable to do any work ; Mays said he must do something for him ; he was so diseased, he expected the negro would die shortly ; saw the same slave afterwards, in possession of plaintiff.

*John Singley and Harriet Singley* stated, the negro was unsound, at the time he was purchased ; he appeared to be diseased and bloated.   Both defendants stated to John Singley, that it was dropsy of the breast.   Mrs. Stroud stated to Harriet Singley, that the negro had dropsy of the breast; and to John Singley, that she believed that the negro would die ; that he would be useless to her, and she wished to patch him up so as to be able to sell him. Defendant, Mays, said several times the negro would die, and that James Singley had played the d—l with him, (Mays,) out in Alabama, as plaintiff would never have heard of the negro's being sick, if James had not told him.   Mrs. Stroud told Harriet Singley, that Dr. Webb said he could not cure the negro, but if she would stop him from work, he could patch him up so that she could sell him.

*Dr. Webb* knew Simon before the sale ; attended on him from 28th Nov. 1844, to 4th April, 1845.   His disease was chronic pneumonia.   In his opinion, Simon was unsound previous to the sale.   He informed defendant of his condition, who told witness the boy had been attacked while working in a gold mine in Carroll County.   A physician in Carroll had been attending on him.

In the opinion of witness, the disease had been preying on the boy for some time, and was still upon him, when witness last visited him. It was doubtful, whether, with the best attention, the disease could be cured at that stage. Witness is of the Botanic, or Thompsonian school of doctors.

*Joseph C. Post* heard Mays and Stroud talking about a trade for the negro. Mays said he was as likely a boy as was in Butts County, and offered the boy at $500. Mays and Stroud, both, afterwards, told witness that one Strickland had offered $500, when Stroud agreed to give $50 more.

*James W. Faulkner* testified that the defendants told him the negro was laboring with dropsy in the chest, and they did not believe he would ever get well. A short time before the sale the negro was pretty "stout at a house-raising."

*Lydia Waller* heard a conversation between James Stroud and Beersheba Stroud, in July, 1846, in which James Stroud said he believed the negro was sound; that he had been sick, but had gotten well.

*Jeremiah Waller* heard Mays tell Stroud about the boy's sickness before the sale. Witness himself told Stroud about it. He (witness) never told John McMichael or Rich'd Shepherd, that he knew nothing about this case.

*Jeremiah Lamsden* knew that Simon had been sick in the spring of 1845, but in the summer and fall he was at work; and a few days before the sale, was at a house-raising, and carried up his corner.

*John McMichael and Richard Shepherd* swore that Jeremiah Waller told them that he knew nothing about this case.

The Jury found a verdict for the plaintiff, for $675; whereupon the defendant moved for a new trial, on several grounds.

The Court granted a new trial, on the ground, alone, that the verdict was "contrary to the evidence."

To this decision, plaintiff's counsel excepted.

Stark, for plaintiff in error, contended—

1. That under all the evidence, the verdict of the Jury was correct; and cited: 3 *Stark. Ev.* 1660, '2. *Wilson vs. Marsh*, 1 *John.* 503. 1 *Greenl. Ev.* §284. *Story on Contr.* §§495, 675.

4 *Camp.* 22.   3 *Ib.* 352.   *Smith's Mer. Law*, 421.   2 *Kent*, 278, 377.   4 *McCord*, 169.   *Smith vs. Mitchell*, 6 *Ga. R.* 458.   4 *Mass.* 488.

2. Where there is evidence on both sides, and no rule of law violated, nor manifest injustice done, although there may appear to have been a preponderance against the verdict, still, a new trial will be refused.   *Graham on New Trials*, 380 *to* 388.

D. J. BAILEY, for defendant.

Is the granting a new trial by the Circuit Courts, subject matter of error?   *Magill vs. Lyman*, 1 *Con. R.* 61.

This Court will control the judgment of the Circuit Courts, only in cases where there is a refusal to exercise, or a flagrant abuse of a sound legal discretion.   *Moody vs. Fleming*, 4 *Ga. R.* 115.   2 *Kelly*, 183.   2 *Hill*, 524.   2 *Bailey*, 13.

Granting new trials depends upon the legal discretion of the Court, guided by the nature and circumstances of the particular case.   *Norris' Peak's Ev. see Notes, page* 263.

Where there is no fraud or agreement to the contrary, if the article turns out not to be that which it was supposed, the purchaser sustains the loss.   *Sweet vs. Colgate*, 20 *John. Rep.* 203. 2 *Black. Com.* 451.

*By the Court.*—LUMPKIN, J. delivering the opinion.

This was an action on the case, in nature of deceit, by James Stroud, against Henry S. Mays and Beersheba Stroud, in the sale of a negro named Simon.   On the trial, there was much testimony adduced on both sides.   The Jury returned a verdict for the plaintiff, for $675; and the Court granted a new trial on the *sole* ground that the verdict was contrary to evidence.   And this writ of error is brought to reverse that decision.

By the Civil Law, where there is no fraud and no agreement to the contrary, in case the article proves to be unsound, or different from what both parties supposed it to be, the loss falls on the seller; by the Common Law, it is thrown on the purchaser. The rule in the one code is, a sound price implies sound property. In the other, *caveat emptor;* the vendor, without express warranty, merely undertaking to make a good title to the vendee,

Stroud *vs.* Mays and Stroud.

who, if he doubts the goodness or quality of the article, or does not choose to incur the risk of a latent defect, may refuse to purchase without a warranty.

In the bill of sale to Simon, there is no warranty, and the present action is brought for the breach of an implied warranty, or as it is sometimes denominated, a warranty in law; that is, it charges the unsoundness of the slave, at the time of the contract, the knowledge of that fact by the owners, and its fraudulent concealment, with reason to believe, on the part of the sellers, at the time, that the purchaser trusted them in regard to the matter.

Had the Court the right, in the proper exercise of its discretion, to set aside the verdict of the Jury?

[1.] In *Peck vs. Land*, (2 *Kelly*, 16,) this Court held the following language: "If it were true, as assumed in the rule, that the verdict was *without* evidence, there could be no doubt in the case. But, by looking into the testimony, we are satisfied that such is not the fact. The rule for our guidance, is clearly defined in the books, and is this: 'That the verdict will not be set aside, as contrary to evidence, where there has been evidence on both sides, and no rule of law violated, nor manifest injustice done, although there may appear to have been a preponderance of evidence against the verdict.' We add: 'If it be true, that in *all* cases facts are the peculiar province of the Jury, and that it is for them to say, in any given case, whether the proof produced be sufficient or not, much more will the Courts refrain from disturbing the verdict, when a question of fraud is submitted to the Jury."

And this conclusion, we are fully persuaded, is in accordance with all the authorities, English and American, upon this subject.

"The question," said Lord *Ellenborough*, in *Carstairs vs. Stein,* (4 *M. & Selw. R.* 192, 199,) "before us, is not, whether the verdict given in this case, is such as we should, ourselves, have given; but whether, having been given by a Jury, to whom the whole case was fully left in point of fact, and to whom the law upon the case was distinctly stated, it ought to be set aside, upon the grounds of the argument now suggested to us, viz: that they have drawn an erroneous conclusion?" He thought not.

And, said *Tilghman*, C. J. in delivering the opinion of the Court, in *Lessee of Felch vs. Good*, (2 *Binn*. 495,): "The cause turned upon matters of fact, and it was submitted to the Jury, resting very much upon the credibility of one of the plaintiff's

witnesses. The character of the witnesses, and the credit which is due to them, are subjects peculiarly within the province of the Jury; and where the verdict has depended on these points, the Court has always refused to interfere, except in extraordinary cases."

[2.] Judge *Story*, in *Alsop vs. The Commercial Insurance Company*, (1 *Sumner's R.* 451,) (and it is always refreshing, in questions of law, to find shelter under his name; it is as the shadow of a great rock in a weary land!) thus expresses himself, on a question precisely similar to the one under consideration: " In considering questions of this nature, I confess myself among those Judges, who are very reluctant to intermeddle with the verdicts of Juries, in mere matters of fact. There was a time when Courts were disposed to go an extravagant length on this subject, and to set aside the verdict of the Jury, merely because, in the opinion of the Court, the weight of evidence was on the other side. This was, indeed, substituting the Court for the Jury, in trying the credibility of testimony, and the weight of evidence. For one, I am not disposed to proceed far upon this dangerous ground; and in matters of fact, I hold it to be my duty to abstain from interfering with the verdict of a Jury, unless the verdict is clearly against the undoubted general current of the evidence; so that the Court can clearly see that they have acted under some mistake, or from some improper motive, or bias, or feeling. *And upon a question of fraud in fact, which is made up of so many ingredients, and is so peculiarly within the province of the Jury, I do not hesitate to say I should be more reluctant to interfere, than in any other case.*"

I am not insensible to the force of the very able and ingenious argument, which has been submitted by the counsel of the defendants in error. But after all, the question recurs, will this Court undertake to say, that there was no fraud in the sale of this negro, when the Jury, upon sufficient evidence, have found that there was? And to justify the Court in setting aside the verdict, it is not sufficient that it should doubt or entertain scruples about the result of the finding. It must clearly see, and be satisfied that it was wrong. Were I in the Jury-box, I am not prepared to say that I should have found differently upon the evidence, in this bill of exceptions.

Keeping in view, then, the proper preservation and protection

of the rights and privileges of the Jury, we are constrained to reverse this judgment, and to hold that their opinion, in a case fairly before them, upon a matter of fact, purely and fitly within their province, about which there was a great variety of testimony on both sides, ought not to be disregarded.

In our judgment, therefore, the motion for a new trial ought not to have been granted.