No. 51.—HOWELL C. FLOURNOY, plaintiff in error, *vs.* JOHN H. NEWTON, defendant.

[1.] Under the Bankrupt Act of 1841, where a discharge is sought to be attacked for fraud, a prior reasonable notice is required to be given, specifying the grounds of fraud ; and the notice may be amended, at any time before the final trial, provided a sufficient time elapse to enable the bankrupt to prepare to rebut it.

[2.] The transfer of his effects, by a bankrupt, in contemplation of bankruptcy, is a fraud upon the law.

[3.] A bankrupt may appropriate so much of his effects as may be necessary to raise the means to maintain his application in bankruptcy.

[4.] Parol evidence is inadmissible to prove the contents of an execution and transfer, in writing, where both facts are material to the issue.

[5.] Where there is conflicting evidence, a mere preponderance against the verdict of the Jury is not sufficient to authorize a new trial.

Assumpsit, &c. in Clarke Superior Court.    Tried before Judge JAMES JACKSON, February Term, 1850.

This was an action by John H. Newton, against Howell C. Flournoy, as indorser on a promissory note made by Charles G. McKinley, dated Jan. 30, 1840.    To this, the defendant pleaded a discharge in bankruptcy, dated Dec. 1st, 1843.    On the trial, the plaintiff proposed to read to the Jury three several notices to defendant, of his intention to impeach the discharge—one dated 29th July, 1845—one dated Jan. 7th, 1847—and the last dated Jan. 27th, 1848.    Defendant's counsel objected to the two last notices, on the ground that no leave of the Court had been obtained to amend the notice first served—which objection was overruled by the Court ; and defendant excepted.

Flournoy *vs.* Newton.

The second notice stated the following grounds :

" 1st. That in contemplation of bankruptcy, you transferred and sold to one George Mews, a judgment obtained by you against one John S. Smith, in Clarke Superior Court, for $55 principal, and $5 50 interest, upon which a *fi. fa.* was issued 23d August, 1838, for some sum equal to, or less than, said *fi. fa.*— to the great detriment and injury of your creditors, who are entitled to a full, fair and accurate inventory of your property, rights, credits, &c.

" 2d. Because, pending your application in bankruptcy, or since said discharge, you sold and transferred the above-named judgment to George Mews—the same not being enumerated in the inventory of your property, required by the Bankrupt Law."

Defendant's counsel objected to any evidence being given under this notice, on the ground that there was no allegation of a fraudulent intent, or any fraudulent act, in relation thereto, specified in the notice. The Court overruled the objection, and defendant excepted.

The plaintiff offered the testimony of George Mews and Everett Yerby, examined by commission, to prove the transfer of the *fi. fa.* in favor of Flournoy against Smith, from Flournoy to Mews, and from Mews to Yerby. Defendant's counsel objected to the evidence, on the ground that they disclosed the fact that the *fi. fa.* of which they testified, was transferred in writing, and parol testimony of the contents of the *fi. fa.* and the transfer are inadmissible. The Court admitted the testimony, and defendant excepted.

The testimony submitted to the Jury on the question of fraud, was, in substance, as follows :

The answers of John H. Newton, the defendant, admitted that he had heard of the application of Flournoy for a discharge in bankruptcy; that Flournoy did offer to sell him a *fi. fa.* on James D. Frierson, (the transfer of which was alleged in one of the notices as a fraud,) for something under $100, which *fi. fa.* he (Flournoy) afterwards sold to Mr. Hancock.

*Thos. Hancock* stated that he did purchase a *fi. fa.* on Frierson for $460, from Flournoy, for $60. Flournoy said his object in selling the *fi. fa.* was to raise money to enable him to proceed

in bankruptcy ; that he was obliged to have it that day, else it would be too late; that he had offered it to Newton at the same price. Witness considered it worth the amount he paid. Frierson was insolvent at the time, and is so still. He has never collected anything on it. Frierson was related to witness—otherwise, he would never have bought it.

*Geo. Mews* received a *fi. fa.* Flournoy *vs.* Smith, from Eliza Parrish, to collect on shares. There was a transfer on it from Flournoy to him—the date not recollected. A levy was made, but he did not know what had become of it. He did not know that Smith was insolvent. Flournoy stated to him that he sold the *fi. fa.* to Mrs. Parrish for $5, to enable him to take the benefit of the Bankrupt Law.

*Everett Yerby* gave $15 for the *fi. fa.* on Smith—the most of it in a debt on Mews. There was a transfer on it—date not recollected. There was a levy and claim—cannot say that Smith was insolvent. If anything collected, he does not know it.

*John Yarborough*—Defendant told witness that he sold the *fi. fa.* against Smith, for $5; that he did so to keep Newton from catching at him. The conversation was about the application for bankruptcy. Defendant said he gave Mrs. Parrish the money to buy the *fi. fa.* She was his woman ; has since become his wife. Witness did not think defendant intended to defraud Newton ; Smith was insolvent, but a hard-working mechanic.

*Asbury Hull* considered Smith entirely insolvent, in 1842 and 1843. Frierson is generally considered insolvent.

The Jury found a verdict for the plaintiff. Defendant moved for a new trial, principally on the ground that the verdict was contrary to the evidence, and the weight of evidence.

The Court refused the motion, but admitted that the verdict was contrary to the weight of evidence ; yet, as the case turned on the question of fraud, while he would not have found the verdict, if upon the Jury, he did not feel at liberty to disturb it.

To which decision, defendant excepted.

And on these several exceptions, error has been assigned.

Hillyer and Hull, for plaintiff in error.

C. Peeples and W. Akin, for defendant.

*By the Court.*—LUMPKIN, J. delivering the opinion.

John H. Newton sued Howell C. Flournoy, as the indorser of a promissory note, made by Charles G. McKinley. The defendant pleaded a discharge in bankruptcy. The plaintiff impeached the discharge for fraud. The Bankrupt Act of 1841, requires the creditor to give reasonable notice, specifying the grounds of fraud. In this case, three notices were filed—the two last of which were objected to, for the reason that no leave of the Court was previously obtained.

[1.] Was it necessary to get leave? Counsel for the plaintiff in error insist, that the notice is a part of the pleadings; that it is in the nature of a replication, and cannot be amended without the permission of the Court. Were this so, the amendment, we apprehend, would be fully authorized by the rules of practice; but we do not consider the notice a part of the pleadings. The Act of Congress requires, that " reasonable notice be given, specifying the grounds of fraud." And the question is, has this been done? The last of the three notices was served in January, 1848, and the final trial of the cause was not had till February, 1850, more than two years thereafter. That time was ample to prepare to rebut the attack. Besides, had the defendant been surprised, he could have moved for a continuance. Failing to do this, we are warranted in presuming that he suffered no injury.

[2.] The second notice was to the effect, that the certificate of bankruptcy would be impeached, because the debtor, in contemplation of bankruptcy, had sold and transferred to one George Mews, a judgment obtained by him against one John S. Smith, in Clarke Superior Court, for the sum of fifty-five dollars, principal, and five dollars and fifty cents, interest, for an amount equal to or less than said judgment, to the great detriment of the plaintiff; and the objection to this notice is, that it contains no allegation, either of any fraudulent act or intention.

All fraud vitiates the discharge, and the second section of the Act declares, expressly, that " transfers of property, in contemplation of bankruptcy," are " utterly void, and a fraud upon the Act," and the same may be set up as an impeachment of the discharge. The specification in the notice is in terms of the law.

[3.] We have been called on to say, whether a bankrupt may

not appropriate a portion of his effects, by sale or otherwise, to raise the means to obtain his discharge ? We think that he may; otherwise, the benefit secured to him by the Act would be unavailing. The question should be submitted to the Jury, under the charge of the Court, whether the assignments in this case were *bona fide* made, to raise the necessary funds to maintain the application, or whether it was done, colorably only, and for the purpose of defeating the creditors.

[4.] The next complaint in order is, that the Court below erred in permitting the plaintiff to introduce parol testimony of the transfer of the Smith *fi. fa.* to Mews—it appearing, in evidence, that said transfer was in writing; and upon this point we are compelled to sustain the plaintiff in error. The charge on the notice is, that this conveyance was made in contemplation of bankruptcy—consequently the date of the transaction is material. It is also alleged, that the execution was assigned for a sum equal to or less than the amount of the judgment. The *amount,* therefore, of the *fi. fa.* is essential; and we know of no principle which will justify us in dispensing with the highest evidence, namely: the execution itself, together with the written transfer. We suppose the doctrine to be too well established to admit of doubt, that whenever it turns out, either in the direct or cross-examination, that a writing exists, with regard to a transaction, which the law esteems as the best evidence, it must be produced, or its absence accounted for; and that if this is not done, all inferior or secondary evidence that may have been given, will be stricken out and disregarded. *Rex vs. Radston*, 4 *Barn. & Adolp.* 208. *Rex vs. Rondor*, 8 *Barn. & Cress*, 708. *Boon vs. Dykes*, 3 *Monroe's Rep.* 529, 531.

But it is ingeniously argued, that the transactions in controversy here, are proven by testimony entirely independent of the writings themselves, to wit: the declarations of the party; and the case of *Sewell vs. Stubbs*, (1 *Carr. & Payne*, 73,) would seem to sustain this position. The better opinion, however, is, that you cannot ask the witness what the opposite party has said, as to the contents of papers executed by him, without accounting for their non-production. *Bloxam vs. Elsee*, 1 *Carr. & Payne*, 558. *VanDusen vs. Fink*, 15 *Pick.* 449. *Ex parte Simpson*, *Charl. R.* 111. *Hart vs. Yunt*, 1 *Watts*, 252. *Wiggin's administrators vs. Pryor's administrators*, 3 *Porter*, 430. *Freeman vs. Peay*, 2 *Bail.*

394. *Northorp vs. Jackson,* 13 *Wend.* 86. *Ramsay vs. Johnson,* 3 *Penn.* 293.

It is well known that we, as a Court, are not latitudinarian, but strict constructionists, as to the great rule of evidence—that where a writing exists, it constitutes the best, if not the exclusive medium of proving the facts to which it relates, and that we have rarely, if ever, yielded to the authority of those *dicta,* or even reported cases in this country, which would allow matter evinced by written evidence, to be proved orally. Our experience is, that the general results of every relaxation of the rule, have soon demonstrated its impropriety. In this very case, if the writing had been produced, it might have turned out, either that the assignment was made after the certificate of discharge was obtained or prior to the passage of the law, and thus have precluded the idea, that it was done in contemplation of bankruptcy.

[5.] The only remaining ground in the record is, that the Court erred in refusing to grant a new trial, because the verdict was contrary to evidence.

We know not that we have any thing to add to the grounds heretofore taken, and so uniformly and firmly maintained by this Court, especially since the decision in *Mays vs. Stroud,* 7 *Ga. Rep.* 269. I would merely remark, that in *Goodman vs. Smith,* (4 *Dev. Law Rep.* 450,) the Supreme Court of North Carolina held, that they would not set aside the verdict, although, in their opinion, founded on *slight* testimony; and Judge *Gaston,* in delivering the opinion, says, " Upon the whole, we do not feel ourselves authorized to say, that there was *no* evidence to be left to the Jury, respecting the fact upon which they found their verdict."

We consider the recent Act of the General Assembly, forbidding the presiding Judge, to *intimate* even his opinion as to the *facts,* and making it a distinct ground of error, as a legislative sanction and indorsement of our efforts to protect the just rights of this co-ordinate branch of the judiciary.

Are we constrained, from an examination of the testimony, to conclude that there was corruption in the Jury box, or that they acted from prejudice against the defendant ? John Yarborough testifies, that Flournoy told him, that he sold the execution against Smith to Eliza Parrish, who was, at that time, his *woman,* for five dollars ;. that he gave her the money to buy it with, and that he

did this " to prevent Newton (the plaintiff) from catching at him."
The proof, then, is, that he conveyed away *all* the property he
had, except his trunk and wearing apparel, in contemplation of
bankruptcy, which is, of itself, a fraud upon the law, and that he
averred to the witness, that his object was to prevent his creditor
from " catching at him." We should not call this *slight* testi-
mony.

Since the argument of this case, my attention has been called
to that section of the Judiciary Act of 1799, which declares, that
if the verdict of the Special Jury be given *contrary to evidence*
and the principles of justice and equity, it shall and may be law-
ful for the presiding Judge to grant a *new trial*. *Prince*, 432.
We do not suppose, however, that this provision was intended to
enlarge the powers of the Court, or to change the great princi-
ples of the Common Law, as to the relative rights and province
of the two departments of the judiciary. Such has not been
the construction put upon it by the Superior Courts of this State.
If a new trial is to be granted merely because, in the opinion of
the Court, the weight of evidence is on the other side, trial by
Jury is virtually annihilated, and the Court will be substituted for
the Jury, in every case, in trying the credibility of testimony and
the preponderance of the proof.

Indeed, this idea is expressly negatived by the preceding sec-
tion, which requires the power to grant new trials, to be exercis-
ed " *according to law*." *Prince*, 432. That is, according to the
usages and customs of the English Courts of Common Law.

By the Act of 1823, (*Prince*, 455,) regulating appeals from the
Court of Ordinary, it is declared to be the policy of this Govern-
ment, to retain the trial by Jury, *in all cases in which matters
of fact are involved*. For the Court, therefore, to undertake to
control the Jury, in matters of fact, is obviously to contravene
this policy.

I am aware that doubts are entertained by many, at this day,
as to this policy. A late popular writer in this country has assail-
ed trial by Jury, with great vehemence, and the conclusion at
which he comes is, that the institution itself, so admirable in mon-
archy, is totally unsuited to a democracy; that the very principle
that renders it so safe, where there is a great central power to re-
sist, renders it unsafe in a state of society in which few have suf-
ficient resolution to attempt even to resist popular impulses.

Be this as it may, our pathway is plain, until the people, through the Legislature, see fit to move in this matter.

We are asked whether, for an act like this, we will see this citizen deprived of the benefit of his discharge? And it is certainly true, that the amount of assets was inconsiderable; still, it was all that he had; but whether much or little, the law exacted of him the utmost good faith, or upon failure, he should, by way of penalty, forfeit the boon which it conferred. And we will only reiterate, in conclusion, what we have often said before, that in questions of fraud, the Jury are much more likely, from their acquaintance with the parties, the witnesses, and the every-day neighborhood transactions of life, to administer full and complete justice, than the Courts. At any rate, it must be a most glaring case which would induce us to disturb their finding in questions of this character.

The judgment of the Court is, therefore, affirmed upon the first, second and fourth grounds in the bill of exceptions, and reversed upon the third.

Judgment reversed.